ESTATE OF STEVEN COLE,

        Plaintiff,

v.                                        Case No.:  14-CV-740

MILWAUKEE COUNTY,
PAULA LUCEY,
MAUREEN PULITO,
BOBBI KORENAK,
NADINE PALMER,
HENRIETTA SMITH,
and WISCONSIN COUNTY MUTUAL
INSURANCE CORPORATION,

        Defendants.

---

## FEDERAL COMPLAINT

---

**NOW COMES** the above-named Plaintiff, Estate of STEVEN COLE, by Special Administrator Robert Cole, by their attorneys, SAMSTER, KONKEL & SAFRAN, S.C. and PITMAN, KYLE, SICULA & DENTICE, S.C., and as for its causes of action against the above-named Defendants, Plaintiff alleges and shows claims for relief as follows:

### INTRODUCTION

1.      The following is a synopsis of the Plaintiff's cause of action:  This is a civil action under the Fourteenth Amendment to the Constitution of the United States and Title 42, United States Code, Section 1983, as well as State of Wisconsin statutory and common law, brought to redress the serious personal injuries and resulting death of Steven Cole, and to obtain compensatory damages, punitive damages, fees and costs for the wrongful death of Steven Cole on June 30, 2011, due to the events that occurred when the Defendants breached their duty of

care and created a danger to Steven Cole by leaving him without one-on-one supervision where food was present, and by allowing him to obtain a discarded sandwich from a garbage can, which led him to choke to death on a piece of food.

## JURISDICTION AND VENUE

### JURISDICTION

2.      This action arises under the Fourteenth Amendment to the United States Constitution and Title 42, United States Code, Section 1983. The Court has jurisdiction pursuant to Title 28, United State Code, Sections 1331 and 1343(a)(3) and (4). The Court also has supplemental jurisdiction over the Plaintiff's state law claims pursuant to Title 28, United States Code, Section 1367(a).

### VENUE

3.      The Eastern District of Wisconsin is the proper federal venue for this action because it is the judicial district where the constitutional and civil rights violations of Steven Cole are alleged to have been committed, pursuant to Title 28, United States Code, Section 1391(b).

## PARTIES

4.      That Plaintiff, Estate of Steven Cole ("PLAINTIFF), proceeds in this action through its appointed Special Administrator, Robert Cole.

5.      That Steven Cole ("STEVEN") was born on October 4, 1940, and was 62 years of age on the date of his death, June 30, 2011.

6.      That STEVEN, on the date of his death, was in the legal and physical custody of Defendant, Milwaukee County, and, since December 30, 1998, was a resident at the Milwaukee County Mental Health Complex Rehabilitation Center Central ("Mental Health Complex" or

"Complex"), which, at all times material hereto, was a skilled nursing facility and/or nursing home within the meaning of federal and Wisconsin law, statutes, regulations and codes, and was located at 9455 Watertown Plank Road, City and County of Milwaukee, State of Wisconsin, 53226.

7.     That Robert Cole is an adult resident of the State of Wisconsin, and is the brother of STEVEN. That Robert Cole was appointed as Special Administrator of the Estate of Steven Cole on September 19, 2011 in Milwaukee County Circuit Court Case Number 11-PR-1425. That copies of the Letters of Special Administration and the Order for Special Administration are attached to this Federal Complaint as Exhibits 1 and 2, and are incorporated as part of this Federal Complaint.

8.     That Defendant, Milwaukee County ("MILWAUKEE"), is a body corporate pursuant to Wisconsin Statute Section 59.01, with its principal offices located at 901 North 9th Street, Room 105, City and County of Milwaukee, State of Wisconsin, 53233.

9.     That Defendant, Paula Lucey ("LUCEY"), at all times material hereto, was an adult resident of the County of Milwaukee and was employed by MILWAUKEE as the behavioral health administrator at the Mental Health Complex. That, at all times material hereto, LUCEY was acting under color of law, was carrying out her duties as an employee of MILWAUKEE, and was acting within the scope of her employment for MILWAUKEE.

10.     That Defendant, Maureen Pulito ("PULITO"), at all times material hereto, was an adult resident of the County of Milwaukee and was employed by MILWAUKEE as a registered nurse at the Mental Health Complex. That, at all times material hereto, PULITO was acting under color of law, was carrying out her duties as an employee of MILWAUKEE, and was acting within the scope of her employment for MILWAUKEE.

3

11. That Defendant, Bobbi Korenak ("KORENAK"), at all times material hereto, was an adult resident of the County of Milwaukee and was employed by MILWAUKEE as a licensed practical nurse at the Mental Health Complex. That, at all times material hereto, KORENAK was acting under color of law, was carrying out her duties as an employee of MILWAUKEE, and was acting within the scope of her employment for MILWAUKEE.

12. That Defendant, Nadine Palmer ("PALMER"), at all times material hereto, was an adult resident of the County of Milwaukee and was employed by MILWAUKEE as a certified nursing assistant at the Mental Health Complex. That, at all times material hereto, PALMER was acting under color of law, was carrying out her duties as an employee of MILWAUKEE, and was acting within the scope of her employment for MILWAUKEE.

13. That Defendant, Henrietta Smith ("SMITH"), at all times material hereto, was an adult resident of the County of Milwaukee and was employed by MILWAUKEE as a certified nursing assistant at the Mental Health Complex. That, at all times material hereto, SMITH was acting under color of law, was carrying out her duties as an employee of MILWAUKEE, and was acting within the scope of her employment for MILWAUKEE.

14. That, upon information and belief, Defendant, Wisconsin County Mutual Insurance Corporation ("WCMIC"), is a domestic corporation, whose mailing address is 22 East Mifflin Street, City of Madison, County of Dane, State of Wisconsin 53703, and whose registered agent, for the purpose of service of process is David Bisek, c/o Aegis Corporation, 18550 West Capitol Drive, City of Brookfield, County of Waukesha, State of Wisconsin 53045. That, upon information and belief, WCMIC was and is engaged in the business of selling and providing policies of liability insurance and conducts substantial business in the County of Milwaukee, State of Wisconsin. That, upon information and belief, at all times material hereto,

4

there was in full force and effect a policy of liability insurance issued by WCMIC to MILWAUKEE and that by virtue of the alleged actions and/or inactions of MILWAUKEE, LUCEY, PULITO, KORENAK, PALMER and SMITH, and pursuant to Wisconsin Statute Section 803.04(2), WCMIC is a proper party Defendant in this action.

## FACTS RELATING TO MILWAUKEE'S UNCONSTITUTIONAL POLICIES

15.     That the Mental Health Complex is part of MILWAUKEE's Behavioral Health Division.

16.     That there is a long, tragic history of a widespread pattern of constitutional violations where Mental Health Complex employees breached their duties of care to Complex residents and/or created dangers to Complex residents.

17.     That the one of the latest victims of the widespread pattern of constitutional violations is STEVEN, because Mental Health Complex employees breached their duty of care and created a danger to STEVEN, by leaving him without one-on-one supervision where food was present, and by allowing STEVEN to obtain and consume a discarded sandwich from a garbage can, which led STEVEN to choke to death on a piece of food on June 30, 2011.

18.     That the moving force behind the widespread pattern of constitutional violations committed by Mental Health Complex employees, including the violations suffered by STEVEN, are the unconstitutional policies of MILWAUKEE, including: (a) the failure to train policy; (b) the failure to discipline policy; and (c) the custom of condoning constitutional rights violations.

### Failure to Train Policy

19.     That supervising resident food intake and maintaining the health and safety of residents are recurring situations that Mental Health Complex employees are certain to face.

5

20. That, upon information and belief, prior to and on June 30, 2011, it was the explicit and/or implicit policy of MILWAUKEE to have a training program that was not adequate to train Mental Health Complex employees to properly supervise resident food intake and to maintain the health and safety of residents, because the training program failed to train Complex employees with respect to: (a) nutrition and hydration maintenance of residents; (b) following and implementing resident service and recovery plans; (c) properly monitoring resident food intake; (d) proper intervention for incidents creating choking risks to residents; and (e) policies regarding resident safety.

21. That, as set forth in the subsequent paragraphs, Mental Health Complex employees engaged in a pattern of constitutional violations by failing to properly supervise resident food intake and failing to maintain the health and safety of residents.

22. That, upon information and belief, after learning of the pattern of constitutional violations committed by Mental Health Complex employees, it was the explicit and/or implicit policy of MILWAUKEE to fail to train Complex employees to properly supervise resident food intake and to maintain the health and safety of residents.

23. That, as a result of MILWAUKEE's failure to train Mental Health Complex employees to properly supervise resident food intake and to maintain the health and safety of residents, Complex employees continued to fail to properly supervise resident food intake and continued to fail to maintain the health and safety of residents, including the failure to properly supervise STEVEN's food intake and the failure to maintain the health and safety of STEVEN.

24. That the explicit and/or implicit policies of MILWAUKEE with respect to the failure to train Mental Health Complex employees, as set forth in the preceding paragraphs, were the moving force behind the constitutional violations suffered by STEVEN.

6

25.     That, had MILWAUKEE trained Mental Health Complex employees to properly supervise resident food intake and to maintain the health and safety of residents, the constitutional violations suffered by STEVEN would not have occurred.

**Failure to Discipline Policy**

26.     That, as set forth in the subsequent paragraphs, MILWAUKEE has a long history of failing to discipline Mental Health Complex employees for misconduct, including, but not limited to, the commission of constitutional rights violations.

27.     That, upon information and belief, prior to June 30, 2011, MILWAUKEE received complaints regarding Mental Health Complex employees engaging in misconduct, including, but not limited to, the commission of constitutional rights violations.

28.     That, upon information and belief, prior to June 30, 2011, MILWAUKEE had actual knowledge and/or notice that Mental Health Complex employees were engaging in misconduct, including, but not limited to, the commission of constitutional rights violations.

29.     That, upon information and belief, prior to June 30, 2011, despite having actual knowledge and/or notice that Mental Health Complex employees were engaging in misconduct, including, but not limited to, the commission of constitutional rights violations, MILWAUKEE took no action to discipline the Complex employees involved.

30.      That, as a result of MILWAUKEE's failure to discipline Mental Health Complex employees for engaging in misconduct, including, but not limited to, the commission of constitutional rights violations, the misconduct and the commission of constitutional violations were allowed to continue, including the constitutional violations suffered by STEVEN.

31.     That, upon information and belief, LUCEY, PULITO, KORENAK, PALMER and SMITH committed the constitutional violations against STEVEN because they believed that they would not be disciplined for their misconduct.

32.     That the explicit and/or implicit policies of MILWAUKEE with respect to the failure to discipline Mental Health Complex employees, as set forth in the subsequent paragraphs, were the moving force behind the constitutional violations suffered by STEVEN.

33.     That, had MILWAUKEE disciplined Mental Health Complex employees for engaging in misconduct, including, but not limited to, the commission of constitutional rights violations, the constitutional violations suffered by STEVEN would not have occurred.

**Custom of Condoning Constitutional Rights Violations**

34.     That, prior to June 30, 2011, MILWAUKEE maintained a custom of condoning constitutional violations by Mental Health Complex employees.

35.     That part of the custom of condoning constitutional violations by Mental Health Complex employees was the failure to discipline Complex employees for misconduct.

36.     That part of the custom of condoning constitutional violations by Mental Health Complex employees was the long, tragic history of a widespread pattern of constitutional violations where Complex employees breached their duties of care to Complex residents and/or created dangers to Complex residents, which will be set forth in the subsequent paragraphs.

37.     That, in 2003, MILWAUKEE allowed the Mental Health Complex's accreditation with the Joint Commission on Accreditation of Health Care to lapse, allegedly due to budget issues, but reportedly due to fear that the Complex would be unable to receive accreditation.

38.     That accreditation with the Joint Commission on Accreditation of Health Care requires strict compliance with accepted standards of patient care and staff training.

39.     That, upon information and belief, in 2009, State of Wisconsin inspectors determined that, by MILWAUKEE allowing the accreditation with the Joint Commission on Accreditation of Health Care to lapse, the standard of care at the Mental Health Complex declined.

40.     That, upon information and belief, on August 16, 2006, Cindy Anczak died at the Mental Health Complex due to complications from starvation and dehydration.

41.     That, upon information and belief, Cindy Anczak died at the Mental Health Complex after suffering a heart attack and pulmonary embolism, after going more than four weeks without adequate food and hydration.

42.     That, upon information and belief, Karl Strelnick is a psychiatrist and was the physician of record for Cindy Anczak while she was a resident at the Mental Health Complex, and was ultimately responsible for her care.

43.     That, upon information and belief, Karl Strelnick surrendered his license with the State of Wisconsin in 1987 for two years after admitting that he had sex with two patients while he was in private practice.

44.     That, under Wisconsin law, it is a felony crime for a psychiatrist to have sex with a patient.

45.     That, upon information and belief, after Karl Strelnick's license was reinstated, the State of Wisconsin placed several restrictions on his license, including a prohibition on contact with female patients.

46.     That, upon information and belief, despite Karl Strelnick's admission that he had sex with two patients in violation of Wisconsin law, and the several restrictions on Dr. Strelnick's license, MILWAUKEE hired Dr. Strelnick as a psychiatrist in 1992.

9

47.     That, upon information and belief, in 2002, a woman alleged that Karl Strelnick had sex with her while she was a resident at the Mental Health Complex.

48.     That, upon information and belief, despite State of Wisconsin investigators finding the woman's allegations credible, no action was taken against Karl Strelnick, allegedly out of concern for the woman's health.

49.     That, upon information and belief, in 2006, following the death of Cindy Anczak, the State of Wisconsin Department of Health and Family Services conducted an inspection of the Mental Health Complex.

50.     That, upon information and belief, in 2006, the State of Wisconsin inspectors found that a 65-year-old patient at the Mental Health Complex was starving and neglected, having lost 44 pounds in three months, and was suffering from dehydration, weakness and over-medication.

51.     That, upon information and belief, in 2006, the State of Wisconsin inspectors determined that the Mental Health Complex's lack of monitoring of food intake led to the death of Cindy Anczak and the condition of the 65-year-old patient.

52.     That, upon information and belief, in 2006, the State of Wisconsin inspectors determined that the death of Cindy Anczak was caused by neglect by Mental Health Complex employees, including Karl Strelnick, nursing staff and nutritionists.

53.     That, upon information and belief, MILWAUKEE paid $125,000 to the family of Cindy Anczak to settle the family's legal claim arising from Cindy Anczak's death.

54.     That, upon information and belief, in 2006, the State of Wisconsin inspectors determined that all of the patients at the Mental Health Complex were in immediate jeopardy.

55. That, upon information and belief, in 2006, the State of Wisconsin inspectors found 11 federal safety and health violations at the Mental Health Complex.

56. That, upon information and belief, in 2006, the State of Wisconsin inspectors determined that the Mental Health Complex "failed to ensure that medical staff was accountable for the quality of care to its patients with regard to the provision of nutritional services."

57. That, upon information and belief, in 2006, a dietician at the Mental Health Complex told the State of Wisconsin inspectors that there were no policies and procedures at the Complex with respect to nutrition and hydration assessments.

58. That, upon information and belief, in 2006, the dietician at the Mental Health Complex also told the State of Wisconsin inspectors that there was no training for Complex medical staff with respect to nutrition and hydration maintenance of patients.

59. That, upon information and belief, in 2006, the State of Wisconsin inspectors also found that the Mental Health Complex failed to protect two residents who were on suicide watch, both of whom died at the Complex from overdoses of contraband narcotic drugs in 2005.

60. That, upon information and belief, in 2006, the State of Wisconsin inspectors determined that the Mental Health Complex failed to conduct room safety checks of the two residents' rooms, and failed to ensure that they did not receive contraband drugs from the outside.

61. That, upon information and belief, in 2008, a consultant prepared a report regarding safety issues at the Mental Health Complex. That, upon information and belief, MILWAUKEE has refused to release a copy of the consultant's report to the public.

62. That, upon information and belief, in July 2009, a female resident at the Mental Health Complex, who was dangerously mentally ill and was supposed to be on birth control

injections, became pregnant after she was placed in the same unit as Omowale Atkins, a resident at the Complex with a history of sexual assault and violence.

63.     That, upon information and belief, Omowale Atkins had sex with the female resident the day she arrived at the Mental Health Complex, and had sex with her several times over the following three weeks.

64.     That, upon information and belief, the female resident told Mental Health Complex employees that Omowale Atkins had sexually assaulted her.

65.     That, upon information and belief, in violation of the Mental Health Complex's explicit policy, the female resident's guardian was never told about the sex with Omowale Atkins.

66.     That, upon information and belief, in violation of the Mental Health Complex's explicit policy, Complex employees waited weeks before informing the female resident's guardian that she was pregnant.

67.     That, upon information and belief, Mental Health Complex employees mismanaged the Omowale Atkins' case from the beginning of his residency at the Complex, ignoring medical orders and falsifying records.

68.     That, upon information and belief, Omowale Atkins was allowed to roam free at the Mental Health Complex, committing four assaults at the Complex between 2004 and 2010.

69.     That, upon information and belief, despite at least seven violations of the Mental Health Complex's explicit policies with respect to Omowale Atkins' case, no Complex employee was ever disciplined.

70.     That, upon information and belief, in 2009, Elaine Sorem, a psychiatrist at the Mental Health Complex's Walk-In Clinic, raised security concerns with respect to several people being found with weapons while at the Complex.

71.     That, upon information and belief, administrators at the Mental Health Complex took no action with respect to Elaine Sorem's security concerns.

72.     That, upon information and belief, because the administrators at the Mental Health Complex failed to take action with respect to Elaine Sorem's security concerns, the Milwaukee County Sheriff's Department initiated a security review of the Complex.

73.     That, upon information and belief, in 2010, the Milwaukee County Sheriff's Department released a report regarding its security review, which found numerous security problems at the Mental Health Complex, including: (a) an out-of-date security system which allows unchecked entrances and exits; (b) an unreliable alarm system which is supposed to alert staff when a patient assault is occurring; (c) several instances of weapons found on patients or visitors; and (d) staff failures to check on patients who required close monitoring.

74.     That, upon information and belief, in January 2010, the United States Centers for Medicare and Medicaid Services and the State of Wisconsin Division of Quality Assurance conducted an inspection at the Mental Health Complex, finding the conditions at the Complex so dangerous that they declared the Complex to be unsafe.

75.     That, upon information and belief, in 2010, the federal and state inspectors determined that Mental Health Complex staff failed to protect 11 of 17 patients, finding that each of the 11 patients had inappropriate sexual contact with another patient and concluding that the 11 patients were in "immediate jeopardy."

76.     That, upon information and belief, in 2010, the federal and state inspectors concluded that the Mental Health Complex's "failure to promote and protect all patients' safety resulted in actual harm" and determined that there was a "systemic failure" to protect patient safety at the Complex.

77.     That, on May 14, 2010, Disability Rights Wisconsin ("DRW"), a private, independent, non-profit organization designated by the state and federal government to protect and advocate for people with mental illness and disabilities, issued a Report titled "Immediate Jeopardy:  Safety and Treatment Concerns at the Milwaukee County Mental Health Complex Acute Care Unit." That a copy of the DRW Report is attached to this Federal Complaint as Exhibit 3, and is incorporated as part of this Federal Complaint.

78.     That the DRW Report set forth the following "major concerns" regarding the Mental Health Complex:  (a) "Failure to keep patients safe;" (b) "Lack of patient-centered care: exclusion of families, inadequate treatment for sexual aggression and substance abuse, overuse of restraints, failure to adequately meet the needs of patients with both a cognitive disability and mental illness, and lack of trauma informed care;" (c) "Lack of viable options for patients and families to report concerns;" and (d) "Inadequate monitoring by the Wisconsin Department of Health Services and lack of appropriate accreditation, in contrast with Wisconsin's other large psychiatric hospitals." (Exhibit 3 at pp.1-2).

79.     That the DRW Report set forth the following concerns regarding "patient safety and care" at the Mental Health Complex:  (a) "The hospital failed to ensure that 10 of 11 patients were safe from inappropriate sexual contact while patients at the hospital;" (b) "Multiple patients alleged that they were sexually assaulted by other patients;" (c) "Some guardians were not notified of these allegations;" (d) "A patient with a long history of sexual aggression and

14

predatory behavior, that was known to [Complex] staff, was not adequately monitored;" (e) "Inadequate nursing care/treatment plans;" (f) "Inadequate physical exams;" (g) "Failure to monitor and document physician-ordered 15-minute behavior checks;" (h) "Staff were not aware of the [C]omplex's policy of no sexual contact between patients on the acute unit;" and (i) "The [Complex] had inadequate policies and procedures to respond to inappropriate sexual contact, including alleged sexual assaults, and to deal with patient consent issues, and/or their policies and procedures were not adhered to." (Exhibit 3 at p.3).

80.     That, upon information and belief, on May 16, 2010, the Mental Health Complex gave a day-pass to resident Emily Towne, who was supposed to report back by the end of that day.

81.     That, upon information and belief, when Emily Towne did not report back of the Mental Health Complex at the end of the day on May 16, 2010, Complex employees did not report her missing for over 24 hours.

82.     That, upon information and belief, Emily Towne was eventually found three days later, lying on the ground near a bus shelter in a severely dehydrated condition.

83.     That, upon information and belief, on September 30, 2010, a female patient at the Mental Health Complex escaped and attacked a woman in a nearby home.

84.     That, on April 30, 2010, the Milwaukee County Board Chairman ordered the Department of Audit to conduct an audit of MILWAUKEE's Behavioral Health Division, which included the Mental Health Complex, regarding patient safety.

85.     That, in October 2010, the Milwaukee County Department of Audit released a Report titled "System Changes are Needed to Help Ensure Patient and Staff Safety at the

Milwaukee County Behavioral Health Division." That a copy of the Audit Report is attached to this Federal Complaint as Exhibit 4, and is incorporated as part of this Federal Complaint.

86.     That the Audit Report indicated that a survey of nurses at the Mental Health Complex conducted in 2010 revealed that 66% of the nurses rated their units at the Complex as either "very unsafe" or "somewhat unsafe." (Exhibit 4 at p.2).

87.     That the Audit Report indicated that, from approximately 2006 to 2010, 411 patients at the Mental Health Complex were involved in 808 violent incidents, including assault, sexual misconduct and property damage. (Exhibit 4 at pp.5-6).

88.     That, upon information and belief, in March 2011, MILWAUKEE hired LUCEY as the behavioral health administrator at the Mental Health Complex.

89.     That, upon information and belief, MILWAUKEE hired LUCEY to replace John Chianelli, who had been demoted by MILWAUKEE due to the problems with patient care and employee training at the Mental Health Complex, as set forth in the preceding paragraphs.

90.     That, upon information and belief, prior to and on June 30, 2011, LUCEY had actual knowledge and/or notice of the history of the problems with patient care and employee training at the Mental Health Complex, as set forth in the preceding paragraphs.

91.     That, prior to and on June 30, 2011, it was the explicit and/or implicit policy of MILWAUKEE not to have a special unit at the Mental Health Complex for dangerous patients who were awaiting criminal prosecution, resulting in dangers to Complex employees and residents.

92.     That, prior to and on June 30, 2011, it was the explicit and/or implicit policy of MILWAUKEE to fail to provide the necessary staff, care, assessments, planning, supervision,

management, documentation, administration, assistance, care and treatment to residents at the Mental Health Complex.

93.     That, as set forth in the preceding paragraphs, prior to and on June 30, 2011, it was the explicit and/or implicit policy of MILWAUKEE to fail to properly train Mental Health Complex employees, resulting in a high turnover rate that led to insufficient staffing at the Complex.

94.     That, prior to and on June 30, 2011, it was the explicit and/or implicit policy of MILWAUKEE to maintain insufficient levels of staffing at the Mental Health Complex, resulting in:  (a) the failure to properly monitor residents; (b) recklessly low nurse and certified nursing assistant to resident ratios; and (c) insufficient time to perform essential functions, all of which created unsafe conditions for residents at the Complex.

95.     That the Mental Health Complex, at all times material hereto, was subject to the requirements of Title 42, United States Code, Section 1396r ("Section 1396r").

96.     That, upon information and belief, prior to and on June 30, 2011, it was the explicit and/or implicit policy of MILWAUKEE to violate the following provisions of Section 1396r with respect to the Mental Health Complex:

      a.  (b)(1)(A) facility must care for its residents as will promote maintenance or enhancement of the quality of life of each resident;

      b.  (b)(2) facility must provide services and activities to attain or maintain the highest practical physical, mental and psychosocial well-being of each resident in accordance with a written plan of care;

      c.  (b)(2)(C) plans of care are to be reviewed and revised after residents are assessed;

      d.  (b)(3)(A) facility must conduct comprehensive, accurate, standardized, reproducible assessments of residents;

e.  (b)(3)(B) each resident assessment must be conducted or coordinated by a registered professional nurse who signs and certifies the completion of the assessment;

f.  (b)(3)(C) resident assessments must be conducted promptly after a significant change in resident's physical or mental condition, and regardless of health of resident, at least once every 12 months;

g.  (b)(3)(D) the results of resident assessments must be used in developing, reviewing and revising resident's plan of care;

h.  (b)(4)(A) facility must provide nursing, specialized rehabilitative services, medically-related social services, and pharmaceutical services to attain/maintain the highest practicable physical, mental, and psychosocial well-being of residents;

i.  (b)(4)(B) facility services must be provided by qualified persons;

j.  (b)(4)(C) facility must provide 24-hour licensed nursing services sufficient to meet the nursing needs of its residents and use the services of a registered professional nurse for at least eight consecutive hours a day, seven days a week;

k.  (b)(5)(B-E) facility must train, re-train and verify competency of nurse aids;

l.  (b)(6)(C) facility must correctly maintain clinical records of all residents;

m.  (c)(1)(A) facility must protect the rights of all residents to be fully informed in advance of any changes in care or treatment and to participate in planning care and treatment or changes in care and treatment;

n.  (d)(1)(A) facility must be administered in a manner that enables it to use its resources effectively to attain or maintain the highest practicable physical, mental and psychosocial well-being of every resident;

o.  (d)(1)(C) the administrator of the facility must be qualified; and

p.  (d)(4)(A) facility must comply with federal, state and local laws/regulations and professional standards.

## FACTS RELATING TO STEVEN COLE

97.    That, at all times material hereto, STEVEN suffered from paranoid schizophrenic anti-social personality disorder.

98.     That, on December 30, 1998, STEVEN was admitted to the Mental Health Complex.

99.     That STEVEN was admitted to the Mental Health Complex to treat his needs in a more secure setting than his prior residence.

100.     That, at all times material hereto, STEVEN was a resident of the Mental Health Complex pursuant to the terms of an Admission Agreement and Waiver, which is attached to this Federal Complaint as Exhibit 5, and is incorporated as part of this Federal Complaint.

101.     That the Admission Agreement and Waiver stated that the Mental Health Complex agreed to provide "such personal services or care as may be required . . . for the health, safety and welfare of [STEVEN]." (Exhibit 5 at p.1).

102.     That the Admission Agreement and Waiver stated that the Mental Health Complex "shall be liable to [STEVEN] for injury, loss or damage only to the extent the same is caused by the negligence of the [Mental Health Complex] or its employees." (Exhibit 5 at p.2).

103.     That, on May 14, 1999, STEVEN was found to be mentally ill and was committed to the Milwaukee County Mental Health Board, pursuant to Wisconsin Statute Section 51.42.

104.     That, on May 5, 2011, the Milwaukee County Circuit Court Probate Division entered a Stipulation and Order for Commitment Extension for Robert Cole in Milwaukee County Circuit Court Case Number 98-ME-1047. That a copy of the Stipulation and Order is attached to this Federal Complaint as Exhibit 6, and is incorporated as part of this Federal Complaint.

105.     That the Mental Health Complex, at all times material hereto, was a skilled nursing facility and/or nursing home within the meaning of federal and Wisconsin law, statutes, regulations and codes.

106.     That the Mental Health Complex, at all times material hereto, was subject to the regulations of Volume 42, Code of Federal Regulations, Part 483.

107.     That the Mental Health Complex, at all times material hereto, held itself out as a specialist in the field of skilled nursing care and/or nursing home services, with the expertise necessary to provide prompt and adequate treatment, assistance and care to residents, including, but not limited to, activities of daily living, food intake, supervision and maintaining health and safety of its residents.

108.     That STEVEN was not free to leave the Mental Health Complex voluntarily.

109.     That, at all times material hereto, MILWAUKEE had legal and physical custody of STEVEN, had a special relationship with STEVEN, and accepted the duty and responsibility for the supervision and control of STEVEN.

110.     That, at all times material hereto, MILWAUKEE had a duty of reasonable care to protect STEVEN from all foreseeable harms.

111.     That, prior to and on June 30, 2011, MILWAUKEE knew and/or should have known that STEVEN had a history of seeking out food, stuffing food in his mouth, having difficulty swallowing, and choking on food.

112.     That, prior to and on June 30, 2011, MILWAUKEE identified STEVEN as having a choking risk and recognized his problem with taking food, stuffing his mouth with food, eating too quickly, not drinking sufficient fluids while eating, rushing from the dining room at the Mental Health Complex, walking and eating at the same time, and choking on food.

113.     That, prior to June 30, 2011, STEVEN suffered multiple choking incidents, requiring Mental Health Complex employees to perform the Heimlich maneuver.

114.    That, on February 24, 2011, in an incident that is strikingly similar to the incident that is the subject matter of this action, STEVEN obtained bread that was not for him to eat, and then he choked on the bread from eating it too fast.

115.    That, prior to an on June 30, 2011, MILWAUKEE had a Policy & Procedure for residents at the Mental Health Complex with respect to "Choking and Aspiration: Prevention, Identification and Management of Individuals at Risk," which is attached to this Federal Complaint as Exhibit 7, and is incorporated as part of this Federal Complaint.

116.    That the "General Prevention, Risk Reduction Strategies and Communication of Risk" section of the Policy & Procedure included the following: "Licensed nursing staff monitor clients in the dining room during meal times for safety. Staff supervise meals/snacks closely, recognize choking and administer appropriate first aid/Heimlich if needed." (Exhibit 7 at p.1).

117.    That the "Choking Risk: Follow-Up and Interventions" section of the Policy & Procedure included the following with respect to residents with an elevated choking risk: "The treatment team will assess any person with an elevated choking risk and will implement a treatment plan to minimize the risk as identified in the assessment." (Exhibit 7 at p.3).

118.    That, pursuant to the Policy & Procedure, MILWAUKEE developed a Recovery Plan for STEVEN, which is attached to this Federal Complaint as Exhibit 8, and is incorporated as part of this Federal Complaint.

119.    That the "Related To" section of the Recovery Plan for STEVEN stated: "Not chewing his food then swallowing, therefore risk of aspiration heightened." (Exhibit 8 at p.1).

120.    That the "Evidenced By" section of the Recovery Plan for STEVEN indicated the following:

> Rushes during meals, questionable aspiration though nothing at this time. Evalu . . . mid tongue pocketing, pooling of food.

Resident fails to utilize liquids to help wash/clear food from mouth. Resident will get up frequently [and] leave table during meals, only to return – eat quickly then leave again. Choked on Brownie on 9/29, needed heimlich . . . airway clearance. See diet restrictions. However his biggest problem is mouth stuffing, eating fast, not using liquids, rushing from dining room, walking and eating.

(Exhibit 8 at p.1).

121.    That the "Approaches" section of the Recovery Plan for STEVEN required Mental Health Complex staff to do the following:

a.    "Staff-to encourage resident to slow down while eating;"

b.    "staff-encourage compliance with diet as ordered;"

c.    "Staff-cue to use liquids to wash food from mouth;"

d.    "Staff-encourage resident to cough and clear throat to show swallowed food;" and

e.    **"CNA-will monitor Steve 1:1 during oral intake."**

(Exhibit 8 at p.1) (emphasis added).

122.    That, pursuant to the Policy & Procedure:  "One to one supervision of a client during meals/snacks means that the trained staff member must be within an arm's length of the patient so as to have an immediate response if the patient develops distress." (Exhibit 7 at p.3).

123.    That, on June 16, 2011, a physician created a Physician's Diet Order for STEVEN. That a copy of the Physician's Diet Order is attached to this Federal Complaint as Exhibit 9, and is incorporated as part of this Federal Complaint

124.    That the "Special Instructions" section of the Physician's Diet Order for STEVEN included a strict prohibition on eating bread. (Exhibit 9 at p.1).

125.     That, on June 30, 2011, PULITO, KORENAK, PALMER and SMITH left STEVEN without one-on-one supervision in the dining room where food was present, contrary to the requirements of the Recovery Plan.

126.     That, on June 30, 2011, PULITO, KORENAK PALMER and SMITH failed to properly secure food away from STEVEN, contrary to the requirements of the Recovery Plan.

127.     That, on June 30, 2011, as a result of the failure to properly conduct one-on-one supervision of STEVEN, and the failure to properly secure food away from STEVEN, he was able to retrieve a discarded sandwich from a garbage can and ingest the sandwich, causing him to choke on a piece of food.

128.     That, on June 30, 2011, after a Mental Health Complex employee requested that paramedics be called to assist STEVEN, there was a delay in calling "911" because the closest telephone was not functional.

129.     That, on June 30, 2011, there was a delay in the paramedics responding to assist STEVEN because the paramedics were given the wrong location inside the Mental Health Complex.

130.     That, on June 30, 2011, STEVEN died from choking on a piece of food that had obstructed his airway.

131.     That as a direct and proximate result of the above-mentioned conduct of MILWAUKEE, LUCEY, PULITO, KORENAK, PALMER and SMITH, STEVEN suffered physical injury, loss of dignity, substantial conscious pain and suffering, mental anguish, emotional distress and wrongful death.

132.     That as a direct and proximate result of the above-mentioned conduct of MILWAUKEE, LUCEY, PULITO, KORENAK, PALMER and SMITH, PLAINTIFF incurred

funeral expenses, medical expenses, out-of-pocket expenses, and damages pursuant to Wisconsin Statute Section 895.04.

133. That the above-mentioned conduct of MILWAUKEE, LUCEY, PULITO, KORENAK, PALMER and SMITH involved reckless and/or callous indifference to the federally protected rights of STEVEN.

## CLAIMS FOR RELIEF

### First Claim for Relief
### Title 42, United States Code, Section 1983
### Due Process – Breach of Duty Created by Special Relationship and State-Created Danger

134. PLAINTIFF realleges and incorporates by reference the allegations in the preceding paragraphs.

135. That, at all times material hereto, MILWAUKEE, LUCEY, PULITO, KORENAK, PALMER and SMITH were "persons" for the purposes of Title 42, United States Code, Section 1983, and acted under color of law to deprive STEVEN of his constitutional rights.

136. That, at all times material hereto, MILWAUKEE, by and through its agents, servants, and/or employees, LUCEY, PULITO, KORENAK, PALMER and SMITH, were engaged in a special relationship with STEVEN, because MILWAUKEE had legal and physical custody of STEVEN, and was legally and/or contractually responsible for the ongoing care, safety, health and welfare of STEVEN.

137. That, MILWAUKEE, by and through its agents, servants, and/or employees, LUCEY, PULITO, KORENAK, PALMER and SMITH, breached its legal and/or contractual duty for the ongoing care, safety, health and welfare of STEVEN, by leaving him without one-on-one supervision where food was present, and by allowing STEVEN to obtain a discarded

sandwich from a garbage can, which led STEVEN to choke to death on a piece of food on June 30, 2011.

138.     That, MILWAUKEE, by and through its agents, servants, and/or employees, LUCEY, PULITO, KORENAK, PALMER and SMITH, breached its legal and/or contractual duty for the ongoing care, safety, health and welfare of STEVEN by:

   a.   failing to implement proper interventions to reduce STEVEN'S risk for choking and/or prevent STEVEN from choking;

   b.   failing to properly assess STEVEN'S needs;

   c.   failing to properly develop, implement and evaluate an individual service plan to meet STEVEN'S needs, including, but not limited to, STEVEN'S need to be adequately supervised whenever food was present or consumed;

   d.   failing to implement STEVEN'S individual service plan;

   e.   failing to follow STEVEN'S physicians' orders to provide one-on-one supervision of STEVEN whenever food was present or consumed;

   f.   failing to provide sufficient numbers of qualified personnel, including nurses, licensed practical nurses and nurse assistants to meet STEVEN'S total needs;

   g.   failing to provide adequate staff and to appropriately train, instruct, supervise and/or hire its employees, representatives, consultants, agents and/or servants;

   h.   failing to have in place appropriate policies and procedures, including, but not limited to, the management and monitoring of residents who have a choking risk and who seek and take foods that are restricted from their diets;

   i.   failing to monitor and supervise STEVEN to keep him safe;

   j.   failing to properly secure food from STEVEN; and

   k.   otherwise failing to follow the appropriate standards of care.

139.     That, MILWAUKEE, by and through its agents, servants, and/or employees, LUCEY, PULITO, KORENAK, PALMER and SMITH, breached its legal and/or contractual duty for the ongoing care, safety, health and welfare of STEVEN by failing to provide STEVEN

with a safe and convenient living environment, in violation of Chapter 50 of the Wisconsin Statutes.

140.     That, MILWAUKEE, by and through its agents, servants, and/or employees, LUCEY, PULITO, KORENAK, PALMER and SMITH, breached its legal and/or contractual duty for the ongoing care, safety, health and welfare of STEVEN by violating STEVEN'S rights to be treated with at all times with courtesy, respect, and full recognition of his dignity and individuality, in violation of Chapter 50 of the Wisconsin Statutes and Chapter DHS 132 of the Wisconsin Administrative Code.

141.     That, MILWAUKEE, by and through its agents, servants, and/or employees, LUCEY, PULITO, KORENAK, PALMER and SMITH, created a danger to STEVEN by leaving him without one-on-one supervision where food was present, and by allowing STEVEN to obtain a discarded sandwich from a garbage can, which led STEVEN to choke to death on a piece of food on June 30, 2011.

142.     That, prior to and on June 30, 2011, MILWAUKEE, LUCEY, PULITO, KORENAK, PALMER and SMITH, knew or should have known that STEVEN had a choking risk and that STEVEN had problems with taking food, stuffing his mouth with food, eating too quickly, not drinking sufficient fluids while eating, rushing from the dining room at the Mental Health Complex, and walking and eating at the same time, all of which presented a threat of danger to STEVEN.

143.     That, prior to an on June 30, 2011, MILWAUKEE, LUCEY, PULITO, KORENAK, PALMER and SMITH knew or should have known that STEVEN had suffered multiple choking incidents, requiring Mental Health Complex employees to perform the Heimlich maneuver, including an incident on February 24, 2011 that is strikingly similar to the

incident that is the subject matter of this action, where STEVEN obtained bread that was not for him to eat and choked on the bread from eating it too fast.

144. That, at all times material hereto, MILWAUKEE, LUCEY, PULITO, KORENAK, PALMER and SMITH were deliberately indifferent to the substantial risk that STEVEN'S problems with taking food, stuffing his mouth with food, eating too quickly, not drinking sufficient fluids while eating, rushing from the dining room at the Mental Health Complex, walking and eating at the same time, and prior choking incidents presented a danger to STEVEN.

145. That the above-mentioned conduct of MILWAUKEE, LUCEY, PULITO, KORENAK, PALMER and SMITH constituted a deprivation of life and liberty in violation of STEVEN'S fundamental due process rights as secured by the Fourteenth Amendment to the United States Constitution, and other and further provisions of the federal and state law.

146. That the above-mentioned conduct of MILWAUKEE, LUCEY, PULITO, KORENAK, PALMER and SMITH was a direct and proximate cause of the injuries and damages to PLAINTIFF, as set forth in the preceding paragraphs.

**Second Claim for Relief**
**Negligence**

147. PLAINTIFF realleges and incorporates by reference the allegations in the preceding paragraphs.

148. That, on September 20, 2011, PLAINTIFF timely filed and served a Notice of Injury upon MILWAUKEE, pursuant to Wisconsin Statute Section 893.80. That the Notice of Injury is attached to this Federal Complaint as Exhibit 10, and is incorporated as part of this Federal Complaint.

149.     That, on January 23, 2014, PLAINTIFF timely filed and served a Notice of Claim upon MILWAUKEE, pursuant to Wisconsin Statute Section 893.80. That the Notice of Claim is attached to this Federal Complaint as Exhibit 11, and is incorporated as part of this Federal Complaint.

150.     That the Notice of Claim was deemed denied by operation of law after allowing 120 days to elapse without receiving a formal and express disallowance of the Claim.

151.     That MILWAUKEE, LUCEY, PULITO, KORENAK, PALMER and SMITH had duties of care with respect to the ongoing care, safety, health and welfare of STEVEN.

152.     That MILWAUKEE, LUCEY, PULITO, KORENAK, PALMER and SMITH breached their duties of care with respect to the ongoing care, safety, health and welfare of STEVEN by leaving him without one-on-one supervision where food was present, and by allowing STEVEN to obtain a discarded sandwich from a garbage can, which led STEVEN to choke to death on a piece of food on June 30, 2011.

153.     That, MILWAUKEE, LUCEY, PULITO, KORENAK, PALMER and SMITH, breached their duties of care with respect to the ongoing care, safety, health and welfare of STEVEN by:

    a.  failing to implement proper interventions to reduce STEVEN'S risk for choking and/or prevent STEVEN from choking;

    b.  failing to properly assess STEVEN'S needs;

    c.  failing to properly develop, implement and evaluate an individual service plan to meet STEVEN'S needs, including, but not limited to, STEVEN'S need to be adequately supervised whenever food was present or consumed;

    d.  failing to implement STEVEN'S individual service plan;

    e.  failing to follow STEVEN'S physicians' orders to provide one-on-one supervision of STEVEN whenever food was present or consumed;

f.  failing to provide sufficient numbers of qualified personnel, including nurses, licensed practical nurses and nurse assistants to meet STEVEN'S total needs;

g.  failing to provide adequate staff and to appropriately train, instruct, supervise and/or hire its employees, representatives, consultants, agents and/or servants;

h.  failing to have in place appropriate policies and procedures, including, but not limited to, the management and monitoring of residents who have a choking risk and who seek and take foods that are restricted from their diets;

i.  failing to monitor and supervise STEVEN to keep him safe;

j.  failing to properly secure food from STEVEN; and

k.  otherwise failing to follow the appropriate standards of care.

154.    That, MILWAUKEE, LUCEY, PULITO, KORENAK, PALMER and SMITH, breached their duties of care with respect to the ongoing care, safety, health and welfare of STEVEN by failing to provide STEVEN with a safe and convenient living environment, in violation of Chapter 50 of the Wisconsin Statutes.

155.    That, MILWAUKEE, LUCEY, PULITO, KORENAK, PALMER and SMITH, breached their duties of care with respect to the ongoing care, safety, health and welfare of STEVEN by violating STEVEN'S rights to be treated with at all times with courtesy, respect, and full recognition of his dignity and individuality, in violation of Chapter 50 of the Wisconsin Statutes and Chapter DHS 132 of the Wisconsin Administrative Code.

156.    That the above-mentioned conduct of MILWAUKEE, LUCEY, PULITO, KORENAK, PALMER and SMITH was a direct and proximate cause of the injuries and damages to PLAINTIFF, as set forth in the preceding paragraphs.

## Third Claim for Relief
## Title 42, United States Code, Section 1983
## Liability of Supervisors

157.    PLAINTIFF realleges and incorporates by reference the allegations in the preceding paragraphs.

158.    That, as set forth in the preceding paragraphs, Mental Health Complex employees committed constitutional rights violations against STEVEN.

159.    That, as set forth in the preceding paragraphs, LUCEY knew that Mental Health Complex employees that she supervised had a practice of committing constitutional violations in similar situations.

160.    That, as set forth in the preceding paragraphs, LUCEY approved, assisted, condoned and/or purposely ignored the Mental Health Complex employees' constitutional violations.

161.    That, as a result of the above-mentioned conduct of LUCEY, PLAINTIFF sustained injuries and damages, as set forth in the preceding paragraphs.

## Fourth Claim for Relief
## Wisconsin Statute Section 895.46
## Indemnification

162.    PLAINTIFF realleges and incorporates by reference the allegations in the preceding paragraphs.

163.    That, at all times material hereto, LUCEY, PULITO, KORENAK, PALMER and SMITH were carrying out their duties as employees of MILWAUKEE, and were acting within the scope of their employment with MILWAUKEE.

30

164.     That the above-mentioned conduct of LUCEY, PULITO, KORENAK, PALMER and SMITH was a direct and proximate cause of the injuries and damages to PLAINTIFF, as set forth in the preceding paragraphs.

165.     That MILWAUKEE is liable, pursuant to Wisconsin Statute Section 895.46, for the payment of any judgment entered against LUCEY, PULITO, KORENAK, PALMER and/or SMITH in this action because they were carrying out their duties as employees of MILWAUKEE, and were acting within the scope of their employment with MILWAUKEE, when they caused the injuries and damages to PLAINTIFF, as set forth in the preceding paragraphs.

**Fifth Claim for Relief**
**Title 42, United States Code, Section 1983**
**Failure to Train Policy**

166.     PLAINTIFF realleges and incorporates by reference the allegations in the preceding paragraphs.

167.     That, all times material hereto, MILWAUKEE was a "person" for the purposes of Title 42, United States Code, Section 1983.

168.     That, prior to and on June 30, 2011, MILWAUKEE had official policies with respect to the training of staff at the Mental Health Complex.

169.     That, prior to and on June 30, 2011, the policy-makers of MILWAUKEE made a conscious choice from various alternatives to follow its official policies with respect to the training of staff at the Mental Health Complex.

170.     That, as set forth above in the preceding paragraphs, prior to and on June 30, 2011, MILWAUKEE'S official policies with respect to the training of staff at the Mental Health

Complex were inadequate with respect to the recurring situations of supervising resident food intake and maintaining the health and safety of Complex residents.

171.    That, prior to and on June 30, 2011, the policy-makers of MILWAUKEE knew or should have known that more and/or different training of Mental Health Complex staff was needed to avoid likely failures to properly supervise resident food intake and failures to maintain the health and safety of Complex residents, and/or this was plainly obvious to the policy-makers of MILWAUKEE.

172.    That MILWAUKEE'S failure to provide adequate training to Mental Health Complex staff caused the violation of STEVEN'S constitutional rights, and the injuries and damages to PLAINTIFF, as set forth in the preceding paragraphs.

### Sixth Claim for Relief
### Title 42, United States Code, Section 1983
### Failure to Discipline Policy

173.    PLAINTIFF realleges and incorporates by reference the allegations in the preceding paragraphs.

174.    That, all times material hereto, MILWAUKEE was a "person" for the purposes of Title 42, United States Code, Section 1983.

175.    That, prior to and on June 30, 2011, MILWAUKEE had official policies with respect to the discipline of staff at the Mental Health Complex.

176.    That, prior to and on June 30, 2011, the policy-makers of MILWAUKEE made a conscious choice from various alternatives to follow its official policies with respect to the discipline of staff at the Mental Health Complex.

177.    That, as set forth above in the preceding paragraphs, prior to and on June 30, 2011, MILWAUKEE'S official policies with respect to the discipline of staff at the Mental

Health Complex were inadequate with respect to the recurring situations of failing to properly supervise resident food intake and failing to maintain the health and safety of Complex residents.

178.    That, prior to and on June 30, 2011, the policy-makers of MILWAUKEE knew or should have known that more and/or different policies with respect to the discipline of Mental Health Complex staff were needed to avoid likely failures to properly supervise resident food intake and failures to maintain the health and safety of Complex residents, and/or this was plainly obvious to the policy-makers of MILWAUKEE.

179.    That MILWAUKEE'S failure to discipline Mental Health Complex staff caused the violation of STEVEN'S constitutional rights, and the injuries and damages to PLAINTIFF, as set forth in the preceding paragraphs.

**Seventh Claim for Relief**
**Title 42, United States Code, Section 1983**
**Custom of Condoning Constitutional Rights Violations**

180.    PLAINTIFF realleges and incorporates by reference the allegations in the preceding paragraphs.

181.    That, all times material hereto, MILWAUKEE was a "person" for the purposes of Title 42, United States Code, Section 1983.

182.    That the above-mentioned conduct of LUCEY, PULITO, KORENAK, PALMER and SMITH, including, but not limited to, failing to properly supervise STEVEN'S food intake and failing to maintain the health and safety of STEVEN, was done in accordance with MILWAUKEE'S custom of condoning constitutional rights violations.

183.    That MILWAUKEE'S custom of condoning constitutional violations is so persistent and widespread, as set forth in the preceding paragraphs, that it was MILWAUKEE'S official policy.

184.   That MILWAUKEE'S custom of condoning constitutional rights violations permitted, encouraged, tolerated or ratified the above-mentioned conduct of LUCEY, PULITO, KORENAK, PALMER and SMITH, all in malicious or reckless disregard or with deliberate indifference regarding the constitutional rights of STEVEN.

185.   That the policy-makers of MILWAUKEE made a conscious choice from various alternatives to follow its custom of condoning constitutional rights violations.

186.   That the policy-makers of MILWAUKEE acted with deliberate indifference to the consequences of its custom of condoning constitutional rights violations.

187.   That MILWAUKEE'S custom of condoning constitutional rights violations caused the violation of STEVEN'S constitutional rights, and the injuries and damages to PLAINTIFF, as set forth in the preceding paragraphs.

## DAMAGES

WHEREFORE, PLAINTIFF, demands judgment against the Defendants as follows:

   a.   In favor of PLAINTIFF, and against MILWAUKEE, LUCEY, PULITO, KORENAK, PALMER and SMITH, jointly and severally, for compensatory and special damages in an amount sufficient to fairly and reasonably compensate PLAINTIFF for STEVEN'S physical injury, loss of dignity, substantial conscious pain and suffering, mental anguish, emotional distress and wrongful death; for the funeral expenses, medical expenses and out-of-pocket expenses; and for other damages provided for by law; and for the violation of the constitutional rights of STEVEN, as set forth above, in an amount to be determined at a trial of this matter;

b. In favor of PLAINTIFF, and against LUCEY, PULITO, KORENAK, PALMER and SMITH, jointly and severally, for punitive damages for the injuries, damages and the violation of the constitutional rights of STEVEN, as set forth above, in an amount to be determined at a trial of this matter;

c. In favor of PLAINTIFF, and against MILWAUKEE for its liability pursuant to Wisconsin Statute Section 895.46, in an amount to be determined at a trial of this matter; and

d. For all costs, disbursements and reasonable attorneys' fees pursuant to Title 42, United States Code, Section 1983, and for such other relief as the Court deems just and equitable.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL OF THIS MATTER ON ALL ISSUES SO TRIABLE.**

*/s/Jonathan S. Safran*
Jerome A. Konkel
SBN: 1000149
Jonathan S. Safran
SBN: 1000881
Jeffrey D. Patza
SBN: 1030512
SAMSTER, KONKEL, & SAFRAN, S.C.
Attorneys for Plaintiff,
Estate of Steven Cole
1110 North Old World Third Street
Suite 405, Riverfront Plaza
Milwaukee, WI 53203
Phone: (414)224-0400
Fax: (414)224-0280
E-mail: jkonkel@skslawyers.com
E-mail: jsafran@skslawyers.com
E-mail: jpatza@skslawyers.com

*/s/Jeffrey A. Pitman*
Jeffrey A. Pitman
SBN:  1001316
Terese M. Halfmann
SBN:  1012281
Julie R. Kipp
SBN:  1080282
PITMAN, KYLE, SICULA & DENTICE, S.C.
Attorneys for Plaintiff,
Estate of Steven Cole
1110 North Old World Third Street
Suite 320, Riverfront Plaza
Milwaukee, WI 53203
Phone: (414) 212-0000
Fax:    (414) 212-0004
E-mail:  jeff@pksd.com
E-mail:  terese@pksd.com
E-mail:  juliek@pksd.com

Date:   June 26, 2014.